**Ronald Joel PRUITT, Petitioner–Appellant,**

v.

**James HEIMGARTNER, Warden, El Dorado Correctional Facility; Mary Nelson, Deputy Warden, El Dorado Correctional Facility SEU; Attorney General of Kansas, Respondents–Appellees.**

No. 15–3118.

United States Court of Appeals, Tenth Circuit.

Aug. 6, 2015.

Ronald Joel Pruitt, Oswego, KS, pro se.

Kristafer R. Ailslieger, Office of the Attorney General for the State of Kansas, Topeka, KS, for Respondent–Appellee.

Before HOLMES, MATHESON, and PHILLIPS, Circuit Judges.

## ORDER DENYING CERTIFICATE OF APPEALABILITY *

JEROME A. HOLMES, Circuit Judge.

Ronald Joel Pruitt, a state prisoner proceeding pro se,[1] seeks a certificate of appealability ("COA") to appeal from the district court's dismissal of a petition for habeas corpus that he filed pursuant to 28 U.S.C. § 2241. In his petition, Mr. Pruitt claimed, *inter alia*, that the Kansas Department of Corrections ("KDOC") and the Kansas Parole Board ("KPB") conspired to retaliate against him for his refusal to participate in a program plan, and that he was deprived of his liberty interest in being considered for parole without due process. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we **deny** Mr. Pruitt a COA and **dismiss** this matter.

## I

Mr. Pruitt was convicted of aggravated sodomy, rape, aggravated kidnapping, and aggravated burglary, and was placed in the custody of the KDOC in 1988. *See Pruitt v. Roberts,* — Kan.App.2d —, 284 P.3d 375, 2012 WL 3966565, at *1 (Kan.Ct.App.2012) (per curiam) (unpublished). Since 1990, Mr. Pruitt has consistently refused to sign a program plan agreement or to participate in a program plan. These plans, which include "activities in education, vocational training, [and] psychological or psychiatric counseling or therapy," are aimed at preparing inmates "to re-enter the community and live without coming in conflict with the law." Kan. Admin. Regs. § 44–5–105(b).

While Kansas has enacted a law *requiring* inmates to enter into program plan agreements that "specify[ ] those ... programs which ... the inmate must satisfactorily complete" in order to be eligible for parole, Kan. Stat. Ann. § 75–5210a, the Kansas Court of Appeals has held that this statute does not apply retroactively to inmates, like Mr. Pruitt, who were convicted prior to its effective date, *see Payne v. Kan. Parole Bd.,* 20 Kan.App.2d 301, 887 P.2d 147, 150 (1994); *accord Reed v. McKune,* 298 F.3d 946, 952–53 (10th Cir. 2002); *see also Pruitt,* 2012 WL 3966565, at *4 ("Because the statutes applied new requirements for parole eligibility, applying them retroactively to inmates who were convicted before the statutes were enacted in 1988 necessarily violates the United States Constitution's ban on ex post facto laws.").[2] Thus, Mr. Pruitt was

---

\* This order is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Federal Rule of Appellate Procedure 32.1 and Tenth Circuit Rule 32.1.

1. Because Mr. Pruitt appears pro se, we afford his filings a liberal construction. *See,*

e.g., *Garza v. Davis,* 596 F.3d 1198, 1201 n. 2 (10th Cir.2010). However, we will not assume the role of his advocate. *See, e.g., Yang v. Archuleta,* 525 F.3d 925, 927 n. 1 (10th Cir.2008).

2. The Kansas Supreme Court does not appear to have opined on this retroactivity question. Insofar as this question is germane to our

not required to sign a program plan agreement with the KDOC. Moreover, Kansas regulations specify that an "inmate shall not be penalized for refusal to participate in a formal program plan." Kan. Admin. Regs. § 44–5–105(c)(1).

In October 2003, the KPB denied Mr. Pruitt parole and declined to consider him again for parole until November 2004. It cited the "serious nature/circumstances" and "violent nature" of his crimes, as well as the expression of "objections regarding [his] parole," as the bases for its decision. R., Vol. I, at 115 (Kan. Parole Bd. Action Notice, dated Oct. 23, 2003). In October 2004, the KPB again denied him parole for the same reasons. It recommended that he complete a sex-offender treatment program, and it put off reconsideration of parole for Mr. Pruitt for three years, until November 2007.

The KPB denied Mr. Pruitt parole a third time in October 2007 and again put off reconsideration for several years—this time until November 2013. In addition to citing the "violent nature of" Mr. Pruitt's crimes and objections that it had received to granting him parole, the KPB noted that he had "denie[d] responsibility." Id. at 116 (Kan. Parole Bd. Action Notice, dated Oct. 24, 2007). It elaborated that "a subsequent parole hearing should be deferred for six (6) years" because there were "no means to measure [Mr. Pruitt's] risk to re-offend; [he] ha[d] not demonstrated the ability to work on the areas needed to reduce his risk to re-offend; [and he was] unwilling to work on the areas necessary to reduce his risk to re-

offend." Id. The KPB again specifically recommended that he complete a sex-offender training program.

In September 2010, after receiving a program classification review indicating that his "[program plan] still ha[d] [a sex-offender treatment program] listed for completion," id. at 100 (Program Classification Review, dated Sept. 16, 2010), Mr. Pruitt filed an administrative complaint. He claimed that the KDOC and the KPB had misclassified him as "an inmate with an Inmate Program Agreement ... with programs to complete" when, in fact, he had "never entered into any program plan or agreement with the KDOC." Id. at 102 (Informal Resolution Attempt, dated Oct. 25, 2010). This misclassification, he alleged, was part of a conspiracy to retaliate against inmates who refused to sign program plan agreements. Mr. Pruitt argued that, by classifying him as subject to a program plan agreement that had not yet been completed, the KDOC and the KPB effectively denied him meaningful consideration for parole.

After exhausting his administrative remedies, Mr. Pruitt filed a habeas petition in state court, arguing, inter alia, that the KDOC and the KPB had conspired to retaliate against him by depriving him of his liberty interest in being considered for parole. See Pruitt, 2012 WL 3966565, at *5–6. Both the Kansas district court and the Kansas Court of Appeals rejected these claims, and the Kansas Supreme Court denied certiorari.

analysis, absent word from the state's highest court, we appropriately look to the Kansas Court of Appeals for the answer. See, e.g., Weiss v. United States, 787 F.2d 518, 525 (10th Cir.1986) ("In predicting how a state's highest court would rule, federal courts must follow intermediate state court decisions, policies underlying the applicable legal princi-

ples, and the doctrinal trends indicated by these policies."); Daitom, Inc. v. Pennwalt Corp., 741 F.2d 1569, 1574 (10th Cir.1984) ("This court must also follow any intermediate state court decision unless other authority convinces us that the state supreme court would decide otherwise.").

Mr. Pruitt then filed the instant habeas petition in federal court under 28 U.S.C. § 2241. In this petition, he again alleged that the KDOC and the KPB had conspired to "retaliate against inmates ... solely because those inmates refused to sign[ ] or enter ... into a Program Plan Agreement," and, as a result, he was suffering a deprivation of his "due process rights and liberty interests in participating in the Kansas Parole program." R., Vol. I, at 12 (Pet. for Writ of Habeas Corpus, filed Nov. 25, 2013). The district court held that there was no due-process violation because Mr. Pruitt had no right to parole either under the United States Constitution or Kansas state law. The court also denied Mr. Pruitt a COA, but granted him leave to proceed *in forma pauperis* on appeal.

## II

On appeal, Mr. Pruitt argues that the KDOC and the KPB impermissibly retaliated against him for his "exercise of his constitutional right ... in refusing to sign" a program plan agreement. Aplt. Opening Br. at 7. He further claims that he was deprived of his "liberty [i]nterest in participating in the Kansas Parole Program" because of this retaliation. *Id.* at 11.

### A

A state prisoner, as here, may bring a habeas action under 28 U.S.C. § 2241 to challenge the execution of his sentence. *See, e.g., Davis v. Roberts,* 425 F.3d 830, 833 (10th Cir.2005). However, "[b]efore an appeal may be entertained, a prisoner who was denied habeas relief in the district court must first seek and obtain a COA from" the circuit court of appeals. *Miller–El v. Cockrell,* 537 U.S. 322, 335–36, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003); *see* 28 U.S.C. § 2253(c)(1)(A). In order to demonstrate his eligibility for a COA, a petitioner must make "a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2)—that is, he must show "that reasonable jurists could debate whether ... the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further," *Fleming v. Evans,* 481 F.3d 1249, 1254 (10th Cir.2007) (quoting *Slack v. McDaniel,* 529 U.S. 473, 484, 120 S.Ct. 1595, 146 L.Ed.2d 542 (2000)); *accord Dulworth v. Jones,* 496 F.3d 1133, 1136–37 (10th Cir.2007).

As we conclude below, Mr. Pruitt cannot make the required showing for a COA with respect to either his retaliation or due-process claim.

### B

To establish retaliation, Mr. Pruitt must demonstrate:

(1) that [he] was engaged in constitutionally protected activity; (2)that the defendant's actions caused [him] to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and (3) that the defendant's adverse action was substantially motivated as a response to [his] exercise of constitutionally protected conduct.

*Shero v. City of Grove,* 510 F.3d 1196, 1203 (10th Cir.2007); *see also Peterson v. Shanks,* 149 F.3d 1140, 1144 (10th Cir. 1998) (" '[P]rison officials may not retaliate against or harass an inmate because of the inmate's exercise of his' constitutional rights." (quoting *Smith v. Maschner,* 899 F.2d 940, 947 (10th Cir.1990))).

■ Mr. Pruitt claims that he has an "absolute" constitutional right of contract and that he was engaging in this "constitutionally protected conduct [by] refusing to sign a" program plan agreement. Aplt. Opening Br. at 13. But, as a four-justice

plurality of the Supreme Court has stated, "inmates surrender upon incarceration their rights to pursue a livelihood *and to contract freely with the State,* as well as many other basic freedoms." *McKune v. Lile,* 536 U.S. 24, 40, 122 S.Ct. 2017, 153 L.Ed.2d 47 (2002) (plurality opinion) (emphasis added). While Mr. Pruitt may choose not to participate in a rehabilitation program (e.g., sex-offender treatment), such a choice is not of constitutional significance. *See Moody v. Daggett,* 429 U.S. 78, 88 n. 9, 97 S.Ct. 274, 50 L.Ed.2d 236 (1976) (holding that prison officials have "full discretion to control" "eligibility for rehabilitative programs" and that these programs do not implicate any "constitutional entitlement"); *see also Lile,* 536 U.S. at 39–40, 122 S.Ct. 2017 (upholding Kansas's decision to deny certain privileges to inmates who chose not to participate in sex-offender treatment programs).

Thus, because Mr. Pruitt was not engaged in constitutionally protected activity when he repeatedly declined to sign a program plan agreement, his retaliation claim does not satisfy the first prong of our standard, *see Shero,* 510 F.3d at 1203; it consequently lacks merit.

## C

Mr. Pruitt's claim that he was deprived of his liberty interest in being considered for parole without due process because of his refusal to sign a program plan agreement is also unavailing.

### 1

In general, "[a] liberty interest may arise from the Constitution itself, by reason of guarantees implicit in the word 'liberty,' or it may arise from an expectation or interest created by state laws or policies." *Straley v. Utah Bd. of Pardons,* 582 F.3d 1208, 1212 (10th Cir.2009) (quoting *Wilkinson v. Austin,* 545 U.S. 209, 221,

125 S.Ct. 2384, 162 L.Ed.2d 174 (2005)). It is well-established that "a liberty interest *inherent* in the Due Process Clause arises upon an inmate's *release* [on parole] from confinement." *Boutwell v. Keating,* 399 F.3d 1203, 1212 (10th Cir.2005) (emphases added); *see also Morrissey v. Brewer,* 408 U.S. 471, 482, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972) ("[T]he liberty of a parolee, although indeterminate, includes many of the core values of unqualified liberty...."). However, "[t]here is no constitutional or inherent right of a convicted person to be conditionally released before the expiration of a valid sentence." *Greenholtz v. Inmates of Neb. Penal & Corr. Complex,* 442 U.S. 1, 7, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979); *accord Malek v. Haun,* 26 F.3d 1013, 1015 (10th Cir. 1994). Instead, any "liberty interest in the *expectancy* of parole" must be expressly created by a state through its parole laws. *Boutwell,* 399 F.3d at 1213 (emphasis added); *see Greenholtz,* 442 U.S. at 12, 99 S.Ct. 2100 (concluding that the Nebraska statute at issue created a liberty interest in "the expectancy of release" by its use of mandatory language).

Absent such a state-created liberty interest, "there simply is no constitutional guarantee that [determinations of parole eligibility] must comply with standards that assure error-free determinations." *Greenholtz,* 442 U.S. at 7, 99 S.Ct. 2100. For example, in *Malek,* we rejected an inmate's claim that his due-process rights had been violated when the Utah Board of Pardons and Parole allegedly applied improper criteria in denying him parole because we concluded that "the Utah parole statute d[id] not create a liberty interest entitling [the inmate] to due process." 26 F.3d at 1016; *accord Straley,* 582 F.3d at 1214–15; *Dock v. Latimer,* 729 F.2d 1287, 1290–92 (10th Cir.1984); *see also Candelaria v. Griffin,* 641 F.2d 868, 870 (10th

Cir.1981) (per curiam) (concluding that New Mexico's parole statute does not create a liberty interest in parole); *Schuemann v. Colo. State Bd. of Adult Parole*, 624 F.2d 172, 175 (10th Cir.1980) (reaching the same result with respect to Colorado's parole statute); *Shirley v. Chestnut*, 603 F.2d 805, 807 (10th Cir.1979) (per curiam) (coming to the same conclusion in reviewing Oklahoma's parole statute).

■ Therefore, in evaluating the due-process claim of Mr. Pruitt, we likewise focus on whether Kansas has created a liberty interest in release on parole—*viz.,* "in the *expectancy* of parole." *Boutwell*, 399 F.3d at 1213 (emphasis added). This is because Mr. Pruitt has not yet been released—i.e., he has not reached "the point at which the *constitutionally-created* liberty interest" attaches. *Id.* at 1212 (emphasis added). Thus, absent such a state-created liberty interest, even if we assume *arguendo* the truth of Mr. Pruitt's allegation that he has been denied parole repeatedly because the KDOC and the KPB are punishing him for refusing to enter into a program plan agreement, he still cannot prevail.

As for the liberty-interest question, the Kansas Supreme Court has opined unequivocally, and, regrettably for Mr. Pruitt, has concluded that its laws do not create a liberty interest in release on parole. *See Gilmore v. Kan. Parole Bd.*, 243 Kan. 173, 756 P.2d 410, 415 (1988) ("[T]he Kansas parole statute does not give rise to a liberty interest when the matter before the Board is the *granting* or *denial* of parole to one in custody." (emphasis in original)).[3] Bereft of such a liberty interest, Mr. Pruitt is not constitutionally entitled to any particular set of procedures and cannot challenge on due-process grounds the fairness of the procedures afforded to him by the KDOC and the KPB.

**2**

**a**

Mr. Pruitt relies on our decision in *Reed* to support his due-process argument. Like Mr. Pruitt, the appellant in *Reed* was a Kansas inmate who had been denied parole repeatedly, and who claimed that these denials were because of his refusal to enroll in a sex-offender treatment program. 298 F.3d at 953. Citing our decision in *Harper v. Young*, 64 F.3d 563 (10th Cir.1995), *aff'd*, 520 U.S. 143, 117 S.Ct. 1148, 137 L.Ed.2d 270 (1997), we stated in *Reed* that "[a]n inmate's interest in participating in a state's parole program is [a] liberty interest inhering directly in the Due Process Clause itself." 298 F.3d at 954. Because the appellant claimed he was denied parole "solely on the basis of his failure to participate" in a treatment program, we found that he could "potentially state a due process violation." *Id.*

At least at first blush, *Reed* would appear to support Mr. Pruitt's claim that he has a protected liberty interest—specifically, one inherent in the Due Process Clause of the Constitution—in participating in Kansas's parole program. However, we are constrained to acknowledge that *Reed* appears to rest on a flawed foundation, and we question whether principles of *stare decisis* would oblige us to follow its lead.

Specifically, *Reed* drew support for its conclusion that the appellant had a liberty interest that was inherent in the Due Process Clause from our decision in *Harper*.

---

**3.** In several persuasive unpublished decisions of our court, panels have confirmed this reading of Kansas's parole statute. *See, e.g., Johnson v. Kan. Parole Bd.*, 419 Fed.Appx. 867, 870–71 (10th Cir.2011); *Ellibee v. Feleciano*, 374 Fed.Appx. 789, 791–92 (10th Cir.2010); *Jeffries v. Roberts*, 354 Fed.Appx. 355, 357 (10th Cir.2009).

*See Reed,* 298 F.3d at 954 (citing *Harper,* 64 F.3d at 564). However, *Harper*'s inherent-due-process holding related to the *revocation* of an inmate's participation in a parole-like program—not the denial of an imprisoned inmate's *eligibility* for parole, as in *Reed. See Harper,* 64 F.3d at 564 (noting that the appellant had been terminated from participation in a program "similar to, although more restrictive than, parole that allows convicts to live and work in society"). In this regard, *Harper*'s analysis was largely predicated on the Supreme Court's decision in *Morrissey. See Harper,* 64 F.3d at 564. In *Morrissey,* the Court held that, once released on parole, a prisoner has a constitutional interest in his *continued* liberty because "his condition is very different from that of confinement in a prison." 408 U.S. at 482, 92 S.Ct. 2593; *see id.* ("[T]he liberty [of a parolee] is valuable and must be seen as within the protection of the Fourteenth Amendment. Its termination calls for some orderly process, however informal.").

As evident from our discussion *supra* (Part II.C.1), however, the Supreme Court and our court have left no doubt that the distinction between revocation of an inmate's existing parole and the denial of his eligibility for parole is one of constitutional import: put succinctly, revocation implicates a liberty interest that inheres in the Due Process Clause, and the denial of eligibility for parole does not. *Compare, e.g., Morrissey,* 408 U.S. at 482, 92 S.Ct. 2593 ("[T]he liberty of a parolee, although indeterminate, includes many of the core values of unqualified liberty...."), *with Greenholtz,* 442 U.S. at 7, 99 S.Ct. 2100 (observing that "[t]here is no constitutional or *inherent right* of a convicted person to be conditionally released before the expiration of a valid sentence" (emphasis added)), *and Boutwell,* 399 F.3d at 1212 (noting that "a liberty interest *inherent* in the Due Process Clause arises upon an in-

mate's *release* [on parole] from confinement" (emphases added)).

Indeed, with crystalline clarity, the Court in *Greenholtz* indicated that *Morrissey*'s inherent-due-process holding—upon which *Reed*'s touchstone, *Harper,* relied—does not apply to an incarcerated inmate's expectancy of parole: "[t]here is a crucial distinction between being deprived of a liberty one has, as in parole, and being denied a conditional liberty that one desires." *Greenholtz,* 442 U.S. at 9, 99 S.Ct. 2100. Thus, the Court recognized that "parole *release* and parole *revocation* are quite different" for purposes of constitutional analysis, *id.;* only the latter (i.e., parole revocation) gives rise to a liberty interest that inheres in the Due Process Clause, *see id.* at 9–11, 99 S.Ct. 2100.

Therefore, *Reed*'s reliance on the inherent-due-process holding of *Harper* appears to be misplaced. More generally, to the extent that *Reed* holds that incarcerated prisoners have a liberty interest inherent in the Due Process Clause in participating in a program that may (or may not) release them on parole, the foregoing authorities cast a pall on it and call its holding into serious doubt.

To be sure, we recognize that "[w]e are bound by the precedent of prior panels absent en banc reconsideration or a superseding contrary decision by the Supreme Court." *Finley v. United States,* 82 F.3d 966, 974 (10th Cir.1996) (quoting *In re Smith,* 10 F.3d 723, 724 (10th Cir.1993) (per curiam)); *see also United States v. Meyers,* 200 F.3d 715, 720 (10th Cir.2000) ("Under the doctrine of *stare decisis,* this panel cannot overturn the decision of another panel of this court."). However, notably, time and time again *prior* to the issuance of *Reed* we have held—consistent with the Supreme Court's *Greenholtz* decision—that if incarcerated inmates, like the

appellant in *Reed*, have a liberty interest at all in the expectancy of parole, it is a product of state law. *See Dock*, 729 F.2d at 1291 (discussing the Tenth Circuit's application of *Greenholtz* ); *see also Straley*, 582 F.3d at 1214–15; *Malek*, 26 F.3d at 1016; *Candelaria*, 641 F.2d at 870; *Schuemann*, 624 F.2d at 175; *Shirley*, 603 F.2d at 807. Indeed, the exact decision upon which *Reed* relies, *Harper*, contains language that runs counter to its inherent-due-process holding. *See Harper*, 64 F.3d at 566 ("[T]he dispositive characteristic that marks the point at which the Due Process Clause itself implies a liberty interest . . . is *the fact of release from incarceration.* The liberty associated with a life outside the walls of a penal facility dwarfs that available to an inmate." (emphasis added)).

In light of these authorities, to the extent that we were to construe *Reed*'s inherent-due-process holding as being in conflict with earlier Tenth Circuit precedent, we would be free under our settled intra-circuit-conflict rule to disregard that holding and adhere to the principles of earlier precedent. *See, e.g., United States v. Rosales–Miranda*, 755 F.3d 1253, 1261 (10th Cir.2014) ("It is axiomatic that 'when faced with an intra-circuit conflict, a panel should follow earlier, settled precedent over a subsequent deviation therefrom.' " (quoting *Haynes v. Williams*, 88 F.3d 898, 900 n. 4 (10th Cir.1996))); *accord United States v. Cruz Camacho*, 137 F.3d 1220, 1224 n. 2 (10th Cir.1998). Thankfully, on these facts, we need not resolve this *stare decisis* question, however. That is because even if *Reed*'s inherent-due-process holding is controlling, that decision's reasoning in disposing of the appellant's due-process claim forecloses Mr. Pruitt's similar claim that his due-process rights were violated.

**b**

Though we concluded in *Reed* that the appellant possessed a liberty interest that inheres in the Due Process Clause, we ultimately rejected his due-process claim because he had failed to establish that his failure to participate in the treatment program was the *only* reason that he was denied parole. *See* 298 F.3d at 954. Indeed, we found the record evidence to be quite to the contrary—*viz.*, the KPB had denied him parole for various reasons other than his refusal to participate in the treatment program, including the "serious nature and circumstances of [his] crime." *Id.* (alteration in original) (citation omitted). Absent such a sole-factor showing, we concluded that the appellant could not demonstrate that his due-process rights were infringed. Put another way, the factor that the appellant deemed to be an impermissible consideration—his failure to participate in the prison's sex-offender program—had to be the sole basis for the KPB's denial of his parole, but it actually was not.

■ Under similar reasoning, Mr. Pruitt's due-process challenge must fail. While the KPB, in denying Mr. Pruitt parole, did suggest more than once that he participate in a program plan—notably, one involving sex-offender treatment—it also repeatedly listed at least two other justifications for denying him parole: the "serious" and "violent" nature of his crimes and "objections [received] regarding [granting him] parole." R., Vol. I, at 115–16. Given these alternative bases upon which the KPB rested its parole decisions, it is evident that Mr. Pruitt's refusal to sign a program plan agreement was not the sole factor that caused him to be denied parole. Therefore, Mr. Pruitt is in materially the same posture as the appellant in *Reed*. And, under our reasoning there, his due-process claim must fail.

## III

Because Mr. Pruitt has not made a substantial showing that he was deprived of a constitutional right, or demonstrated that the issues raised in his habeas petition are adequate to deserve encouragement to proceed further, we **DENY** his application for a COA and **DISMISS** this matter.